MICHAEL LOZEAU (SBN 142893)
RICHARD DRURY (SBN 163559)
Lozeau Drury LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
richard@lozeaudrury.com
(510) 836-4200


JESSICA F. TOWNSEND
(*Pro hac vice* application forthcoming)
WILLIAM S. EUBANKS II
(*Pro hac vice* application forthcoming)
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
jessica@eubankslegal.com
bill@eubankslegal.com
Tel: (202) 780-7286

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| FRIENDS OF THE EARTH, | |
| Plaintiff, | Case No. |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| JENNIFER GRANHOLM, in her official capacity as Secretary of the Department of Energy; UNITED STATES DEPARTMENT OF ENERGY, | |
| Defendants. | |

1
Complaint for Declaratory and Injunctive Relief

## INTRODUCTION

1.    This case challenges the award of over $1 billion in federal funding to keep the aging Diablo Canyon Power Plant ("DCPP" or "Diablo Canyon") from shutting down. The U.S. Department of Energy's ("DOE") approval of this award involves a fundamentally flawed and arbitrary process under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. DOE purported to satisfy its NEPA obligations under the new Civil Nuclear Credit Program ("CNC program") by adopting an over 50-year old environmental analysis, along with other outdated and incomplete NEPA documents—that taken together are grossly deficient to satisfy DOE's NEPA obligations for this award—in lieu of either conducting its own original or supplemental NEPA analysis, subject to public participation or any opportunity to comment, in support of DOE's January 2, 2024 Record of Decision ("ROD") authorizing the award of funding.

2.    DOE's attempt to repackage these prior NEPA documents as its own "Final Environmental Impact Statement" fails to satisfy the basic requirements for adoption under NEPA, which are intended to help agencies avoid unnecessary duplicative work—not enable them to sidestep the mandate to take a hard look at the environmental impacts of the current action under review, disclose those impacts to the public, consider alternatives that could reduce and/or mitigate those impacts, and provide the public with a meaningful old opportunity for notice and comment so that the decisionmakers can render informed and thoughtful decisions. Here, by ignoring the fundamental differences between the original action and the current action under review and by adopting severely outdated and incomplete NEPA documents, DOE has committed significant federal funding to support continued operations at two outdated nuclear reactors without any lawful NEPA process.

Complaint for Declaratory and Injunctive Relief

3.      Even more concerning, the CNC award will allow Diablo Canyon to continue operating beyond the horizon that the existing NEPA documents contemplated. Pursuant to this award, PG&E will receive payments for Diablo Canyon over a four-year period from January 2023 to December 2026, with payment of credits set to *begin* in 2025 (retroactively at first and then on an annual basis). But DOE relied on outdated NEPA documents in which the Nuclear Regulatory Commission ("NRC") only analyzed impacts up to the point at which the existing licenses would expire, in November 2024 and August 2025 for Units 1 and 2, respectively. By turning around and using these same outdated and flawed NEPA analyses to green light operation of the DCPP *beyond* 2025 (which those prior analyses did not contemplate, let alone evaluate), DOE has taken Diablo Canyon into uncharted territory. Indeed, the bulk of the environmental analysis adopted by DOE here was prepared before the DCPP was even operational and in fact, the environmental impacts from extending the lifespan of this aging power plant at this point in time have not been adequately addressed or disclosed to the public, or been the subject of any meaningful public participation through comments, hearings, or other such opportunities to propose alternatives or raise concerns about the myriad impacts of DOE's award.

4.      At minimum, DOE must acknowledge and account for potential impacts from accidents—especially those involving release of deadly radiation—including, but not limited to, updated demographic data, analysis of the integrity of plant infrastructure, and an accident analysis that accounts for several newly discovered earthquake faults in the vicinity of DCPP. A lawful analysis must also include the current ecological impacts from DCPP's outmoded once-through cooling system and a comprehensive cumulative impacts analysis, which is wholly lacking from earlier NEPA documents. This impact analysis must account

Complaint for Declaratory and Injunctive Relief

not only for the award period through 2026, but beyond and for as long as DOE determines the DCPP is likely to remain operational.[1]

5.    Nothing DOE did as part of its effort to shoehorn in a few pages of more "recent analysis" into its republication of generations-old NEPA documents can cure these fundamental legal defects or satisfy DOE's obligation to actually take a hard look at the impacts of, and alternatives to, extending the lifespan of the Diablo Canyon Power Plant through the CNC credit award in a manner that complies with both the spirit and letter of NEPA. To the contrary, DOE's belated attempt to include an abbreviated and incomplete discussion of environmental impacts only serves to highlight what the agency failed to disclose to the public (and solicit comment on) before this decision was final, as well as the impact analysis and alternatives consideration that *still* remains to be done.

6.    DOE's decision to authorize the final CNC award presents multiple violations of NEPA; its implementing regulations, *see* 40 C.F.R. Part 1500; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. It does so by adopting a set of outdated NEPA documents that, even taken together, do not constitute an adequate EIS under NEPA's implementing regulations; by republishing these earlier NEPA documents as final—i.e. without going through any draft publication or public comment process—despite the fact that the original action and the current action are not "substantially the same"; and by failing either to supplement the existing NEPA documents or to prepare an original, adequate EIS and make those drafts available for proper public notice and comment, DOE has violated NEPA, its regulations, and the APA.

---

[1] PG&E has applied to the NRC for a 20-year license renewal for each of its twin reactors. If granted, this would approve the facility for continued operations through 2044 and 2045. Friends has moved to intervene in this proceeding.

Complaint for Declaratory and Injunctive Relief

**JURISDICTION AND VENUE**

7.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (civil action against the United States), and 5 U.S.C. § 702 (the APA).

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the environmental impacts resulting from the CNC award will occur in and impact this district.

9.    This Court may grant the relief requested pursuant to 28 U.S.C. § 2201 (authorizing declaratory relief); 28 U.S.C. § 2202 (authorizing injunctive relief); and 5 U.S.C. §§ 701-706 (providing for judicial review of agency action under the APA, and identifying vacatur and remand of agency action as the default remedy).

**PARTIES**

10.    Plaintiff FRIENDS OF THE EARTH ("Friends") is a grassroots 501(c)(3) non-profit organization dedicated to improving the environment and creating a more healthy and just world. The organization was founded in 1969 by David Brower in part to protest safety and environmental issues at the newly emerging Diablo Canyon. Friends has more than 226,000 members in all 50 states and the District of Columbia, approximately 32,200 of whom reside in California. In addition to formal members, Friends has more than 8.7 million online activist supporters across the country.

11.    In 2016, after years spent working toward a just and safe decommissioning of Diablo Canyon, Friends entered into an agreement with PG&E and others whereby Diablo Canyon would retire in 2024 and 2025. In exchange, Friends agreed to dismiss its active legal challenges over Diablo Canyon's license renewal. However, in September 2022, the State of California passed legislation supporting Diablo Canyon's extension for five additional years

beyond its planned retirement. PG&E now has license renewal applications pending with the NRC, which seeks 20 additional years for each reactor, and is now authorized to receive up to $1.1 billion from DOE under the CNC program to support this extension. Thus, while the reactors were slated to close in 2024 and 2025 at the expiration of the two active NRC licenses, respectively, they will remain operational as a direct result of the CNC award, which extended the facility's lifetime at least through 2026 and likely beyond. Friends is deeply concerned over the potential for significant harm to the environment and public safety as a result of this extension.

12. Friends has members who live, work, and own property within 50 miles of the Diablo Canyon reactors. The health and safety of Friends' members who live and work in close proximity to Diablo Canyon, and the health of the surrounding environment, could be catastrophically harmed by a release of radiation from an accident or equipment failure at one or more of the Diablo Canyon reactors. This includes the risk of accidents due to earthquakes along any one of the nearby faults that have been discovered since the facility was last assessed for seismic risks. For example, Friends members Lucy Jane Swanson (San Luis Obispo, CA), Julie Mansfield-Wells (Los Osos, CA), Jill ZamEk (Arroyo Grande, CA), and Linda M. Seeley (Los Osos, CA) each live in the vicinity of DCPP and believe, based on current information regarding the infrastructure integrity at DCPP and new information regarding seismic risks (among other new information), that extending the lifespan of DCPP poses an unacceptable radiological accident risk to the health and safety of them, their families, and their communities.

13. In addition to this risk of catastrophic radiation exposure, Friends' members also use and enjoy the central California coast, including the area around DCPP, and visit it regularly for activities such as fishing, boating,

swimming, and exploring tidepools. For example, member Julie Mansfield-Wells is a frequent visitor to Avila Beach near the DCPP, where she enjoys the beach and ocean with her family, and she also regularly takes sailboats and canoes out into Morro Bay for fishing. The continued operation of the DCPP, as a result of DOE's January 2024 ROD approving the CNC award and extending the lifetime of the plant, will prolong the already severe damage to the ecological health of adjacent coastal area caused by the plant's outdated once-through cooling system. The organization's members will therefore suffer aesthetic, recreational, scientific, and other injuries caused by DOE's award extending the life of DCPP.

14.    Friends regularly submits comments as part of NEPA and other decisionmaking processes in connection with federal actions that will affect the interests of Friends and its members. For example, Friends has submitted—and will continue to submit—comments and other proactive communications to the NRC regarding the damaging impacts of continued operation of the DCPP, as part of prior and future NRC processes related to Diablo Canyon's operations. Friends' and its members' interests were severely harmed by DOE's failure to invite their participation in DOE's decisionmaking process to decide whether to award funds to extend the life of Diablo Canyon. Had DOE not deprived them of their right to comment on this federal action, Friends and its members (including those named in this Complaint) would have submitted extensive comments identifying serious environmental impacts that will result from DOE's decision (including impacts that no prior NEPA analysis has ever evaluated), cumulative impacts that must inform DOE's decision (which also have never been evaluated by any prior NEPA analysis), and alternatives that DOE must consider to reduce and/or mitigate the impacts of this action. Because DOE failed to solicit public comment or offer any other recognized means of public participation in the agency's decisionmaking process, Friends and its members were gravely harmed

Complaint for Declaratory and Injunctive Relief

by DOE's failure to follow the lawfully required procedures required by NEPA and the APA.

15.   The ongoing injuries that Friends and its members are suffering are the direct result of DOE's actions, including its flawed adoption of outdated, deficient NEPA analyses and its failure to solicit public comment or to allow any other opportunity for meaningful public participation in DOE's funding award that will allow the DCPP to operate well beyond its anticipated license expiration. The injuries of Friends and its members and supporters can be redressed by a ruling from this Court declaring DOE's adopted EIS legally inadequate; vacating DOE's EIS and ROD that authorized the CNC award; and remanding these matters to DOE for further consideration consistent with federal laws.

16.   Defendant JENNIFER GRANHOLM is the Secretary of the Department of Energy and is directly responsible for the supervision, management, and control of the agency. Accordingly, she is responsible for overseeing DOE's actions challenged in this lawsuit and is sued in her official capacity.

17.   Defendant DEPARTMENT OF ENERGY prepared the ROD authorizing the final award of credits to Diablo Canyon and served as the lead agency in adopting the FEIS challenged in this action.

## LEGAL BACKGROUND

*National Environmental Policy Act*

18.   Congress enacted NEPA in 1969 to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA is intended "to ensure Federal agencies

Complaint for Declaratory and Injunctive Relief

consider the environmental impacts of their actions in the decision-making process" and it "establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C.F.R. § 1500.1(a).

19.  The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies." Id. § 1500.3(a).[2] NEPA regulations are "intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies." *Id.* § 1500.1(b).

20.  To this end, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii). The purpose of the EIS "is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable

---

[2] Current CEQ regulations apply in this case. Adopted NEPA documents must be adequate "under the regulations in this subchapter." 40 C.F.R. § 1506.3(a). Accordingly, the regulations in place at the time of DOE's July 2023 adoption of the NRC NEPA documents, as well as the January 2024 ROD, apply here.

Complaint for Declaratory and Injunctive Relief

alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

21.   The EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13. The alternatives analysis, described by CEQ as the "heart of the NEPA process," CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (March 23, 1981), must then "present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16)." 40 C.F.R. § 1502.14.  Each alternative should be "considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." *Id.*

22.   Agencies are directed to consider a broad range of environmental effects, defined as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," 40 C.F.R. § 1508.1(g), including "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts and must address them in the EIS "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.1(g)(4).

23.   Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.1(g)(1), (2). Cumulative impacts are those that result from the "incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable future actions," regardless of whether undertaken by other federal agencies or private third parties. *Id.* § 1508.1(g)(3). "Cumulative impacts

Complaint for Declaratory and Injunctive Relief

can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

24.   As an alternative to preparing an original EIS in every instance where one is required, an agency may adopt a draft or final EIS, or portion thereof, prepared by another federal agency "provided that the statement . . . meets the standards for an adequate statement . . . under the regulations in this subchapter." 40 C.F.R. § 1506.3(a). Further, "[i]f the actions covered by the original [EIS] and the proposed action are substantially the same, the adopting agency shall republish it as a final statement consistent with [40 C.F.R.] § 1506.10." 40 C.F.R. § 1506.3(b)(1). But where "the actions are not substantially the same, the adopting agency shall treat the statement as a draft and republish it, consistent with § 1506.10." *Id.* In the latter scenario—i.e., where an adopting agency must treat the prior EIS as a draft (rather than final) EIS—the procedures attending to a draft EIS, including the requirement to solicit public comment, must be followed. *See, e.g., id.* § 1503.1(a).

*Infrastructure Investment and Jobs Act and the Civil Nuclear Credit Program*

25.   Enacted on November 15, 2021, the Infrastructure Investment and Jobs Act ("IIJA"), was designed to provide a once-in-a-generation investment in America's aging infrastructure. Among the Act's numerous programs, the CNC Program was established as a "$6 billion strategic investment through the Bipartisan Infrastructure Law to help preserve the existing U.S. reactor fleet and save thousands of high-paying jobs across the country."[3]

---

[3] Although Diablo Canyon was already slated to close, the California legislature passed SB 846 on September 1, 2022 and Governor Gavin Newsom signed the bill into law the next day, which, among other things, incentivized PG&E to apply for certification under the new CNC Program.

Complaint for Declaratory and Injunctive Relief

26.   The IIJA directed that the Secretary of Energy "establish a civil nuclear credit program . . . (1) to evaluate nuclear reactors that are projected to cease operations due to economic factors; and (2) to allocate credits to certified nuclear reactors." 42 U.S.C. § 18753(b)-(b)(2). The statute provides that, in order to receive funds, a nuclear reactor must complete the following steps: submit a certification application; if certified, submit a sealed bid for credits; and then be selected via auction among the certified applicants to receive credits over the 4-year award period.

27.   First, to obtain certification, an operator of a nuclear reactor must submit an application to the Secretary containing the following information demonstrating economic eligibility: "information on the operating costs necessary" to determine eligibility, including "average projected annual operating loss . . . over the 4-year period for which credits would be allocated"; "an estimate of the potential incremental air pollutants that would result if the nuclear reactor were to cease operations"; "known information on the source of produced uranium"; as well as "a detailed plan to sustain operations at the conclusion of the applicable 4-year period . . . ." 42 U.S.C. § 18753(c)(1)(A)(i)-(iv).

28.   The Secretary must then determine whether or not to certify a reactor depending on whether it meets each of the following minimum requirements: the reactor "is projected to cease operations due to economic factors"; "pollutants would increase if the nuclear reactor were to cease operations and be replaced with other types of power generation"; and "the [NRC] has reasonable assurance that the nuclear reactor . . . will continue to be operated in accordance with the current licensing basis" and "poses no safety hazards." *Id.* § 18753(c)(2)(A)(ii)(I)-(III).

29.   Once certified, a nuclear reactor may then submit a sealed bid to become eligible to receive credit allocations. The bid must "describe[] the price

Complaint for Declaratory and Injunctive Relief

per megawatt-hour of the credits desired" and "include[] a commitment, subject to receipt of credits, to provide a specific number of megawatt-hours of generation during the 4-year period for which credits would be allocated." *Id.* § 18753(d)(1)(A)-(B). Under the statute, the Secretary is directed to "establish a process for evaluating bids submitted under subsection (d)(1) through an auction process" and "select certified nuclear reactors to be allocated credits." *Id.* § 18753(e)(1)(A)-(B). If selected, the statute provides that "a certified nuclear reactor shall be allocated credits for a 4-year period beginning on the date of selection." *Id.* § 18753(e)(2). This allocation is further subject to the requirement of periodic audits. *Id.* § 18753(g)(1).

*CNC Guidance*

30.   DOE issued a guidance document in April 2022, which it later revised in June 2022, providing additional detail on the requirements to participate in the CNC Program for the first award cycle.[4]

31.   In addition to setting forth the standard requirements for a certification application, *see* Guidance at 13-30, DOE also specified that the first award cycle will be expressly limited to nuclear reactors "that are projected to cease operations imminently and with a high degree of certainty." *Id.* at 5. Specifically, "to ensure the first award cycle of the CNC Program is directed toward Nuclear Reactors most at risk of imminent closure, the Applicant must demonstrate that it has made a public filing on or before November 15, 2021, the date of enactment of the IIJA, announcing its intention to permanently cease operations of the Nuclear Reactor on or before September 30, 2026." *Id.* at 11.

---

[4] *See* U.S. Department of Energy, *Guidance for the Civil Nuclear Credit Program, Revision* 1 (June 30, 2022), https://www.energy.gov/gdo/civil-nuclear-credit-first-award-cycle (follow link to CNC Amended Guidance – June 2022) (hereinafter "CNC First Award Guidance" or "Guidance").

32.   After rendering a decision on whether to certify a nuclear reactor as eligible for the CNC program, the Guidance states that DOE must render a conditional award decision within 30 days. *Id.* at 7. Following the conditional award decision, DOE must then execute the Credit Redemption Agreement, make the Final Award Selection and issue credits to the selected reactors "as soon as reasonably practicable after the announcement of Conditional Award Decisions." *Id.* at 9.

33.   The statute expressly requires, however, that all environmental review must be completed prior to DOE's finalization of any award: "DOE will not execute any Credit Redemption Agreement or make any Final Award until it has completed its obligations pursuant to the National Environmental Policy Act (NEPA), Section 106 of the National Historic Preservation Act, and any other obligations pursuant to relevant environmental laws (e.g., Endangered Species Act)." *Id.* at 30. Regarding NEPA specifically, the Guidance further states that "[i]n order to meet its NEPA obligations, DOE anticipates adopting, or adopting and supplementing, the Final Environmental Impact Statement prepared for the Selected Nuclear Reactor by the NRC." *Id.* at 41.

34.   Once these conditions are satisfied and the award is finalized, credits are issued "in the form of a voucher for payment," and are subject to adjustment downward to reflect any necessary revenue or capital adjustments necessary at the end of the Award Year. *Id.* at 33-34. Within 90 days of the completion of the Award Year, the Selected Nuclear Reactor "shall submit a Payment Certificate to make a request for Payments" and DOE "shall pay to the Selected Nuclear Reactor, within thirty (30) days of submission, less any necessary adjustments." *Id.* at 34-35.

Complaint for Declaratory and Injunctive Relief

# FACTUAL BACKGROUND

*Diablo Canyon Power Plant*

35.   The DCPP is an electricity-generating nuclear power plant located near the community of Avila Beach in San Luis Obispo County, California operated by Pacific Gas & Electric ("PG&E"). After the permanent shutdown of the San Onofre Nuclear Generating Station in 2013, it is the only remaining operational nuclear power plant in the state. The facility has been in operation since 1985 and contains two pressurized water reactor units. Unit 1 is currently licensed until November 2, 2024 and Unit 2 until August 26, 2025.

36.   Despite these impending expiration dates, both units have received NRC authorization, through an exemption to the "Timely Renewal Rule," to continue operations under their current licenses indefinitely.[5] Under normal circumstances, if a licensee of a nuclear power plant submits a renewal application that is sufficient for the NRC's review at least five years before expiration of the existing license, NRC can authorize the plant to continue operating until the application has been finally determined. *See* 10 C.F.R. § 2.109(b). As the NRC itself explains, the Timely Renewal Rule was designed "to protect licensees who have complied with agency rules in applying for a renewed license from losing valuable rights because of delays in the administrative process."[6]

_____

[5] Friends has an active legal challenge pending before the U.S. Court of Appeals for the Ninth Circuit, which seeks review of NRC's authorization.

[6] NRC, Reactor License Renewal Process, https://www.nrc.gov/reactors/operating/licensing/renewal/process.html#timely-renewal.

37.   Diablo Canyon did not comply with this explicit regulatory requirement; however, in March 2023, NRC granted the DCPP an exemption from its timely renewal requirements "provided ["PG&E"] submits a sufficient license renewal application for the reactors by December 31, 2023.[7] PG&E thereafter submitted a license renewal application for both units on November 7, 2023, which now allows Diablo Canyon's "operating license to continue beyond its expiration dates [] until NRC makes a final determination on DCPP's license renewal application."[8] There is no statutory or regulatory deadline for the NRC to act on this license renewal application, meaning that the DCPP can operate indefinitely beyond the expiration dates in the current licenses, until NRC reaches a final determination.

38.   This exemption from the timely renewal requirements together with the financial lifeline supplied by the CNC award, will directly result in DCPP operating through 2026 and quite possibly beyond, which is well past the timeframe contemplated by any previous NEPA process (which in 1993, at the time of the last NEPA assessment looking at the full facility, extended only to September 22, 2021 for Unit 1 and April 26, 2025 for Unit 2). The certification application under the CNC program requires that the reactor present "a detailed plan to *sustain operations* at the conclusion of the applicable 4-year [award] period." 42 U.S.C. § 18753(c)(1)(A)(iv) (emphasis added); *see also* CNC Guidance at 12. The CNC Guidance also expressly allows funding to be directed

---

[7] NRC, Press Release (March 2, 2023), https://www.nrc.gov/cdn/doc-collection-news/2023/23-015.pdf

[8] *See* Record of Decision for the Final Environmental Impact Statement for the Civil Nuclear Credit Program Proposed Award of Credits to Pacific Gas and Electric Company for Diablo Canyon Power Plant, 89 Fed. Reg. 69, 70 (January 2, 2024).

towards capital improvements,[9] including investments for the specific purpose of "life-extension." CNC Guidance at 7. Given these instructions and having ultimately received over $1 billion to keep the DCPP operational, some of which will likely be directed to such life-extending investments, it is reasonably foreseeable that the plant will remain in operation for some indefinite period of time past the end of the award period. NRC's actions in exempting the DCPP from the timely renewal requirements further reinforce that. The application renewal process is likely to take years and there is no deadline under which NRC must reach a decision on the DCPP's application. Extending the lifespan of this facility—particularly past the bounds of prior NEPA analyses—carries new public safety and environmental risks and compounds existing harms. Given this likelihood, NEPA demands that DOE take a hard look at the impacts described below, not just until the end of 2026, but into the indefinite future, as bounded by DOE's judgment as to when the DCPP is likely to cease operations despite the new capital improvements resulting from the CNC award.

39.   Whether from internal equipment failures, seismic events, or possible terrorist acts, even in the best of times all nuclear reactors carry a risk, however remote, that an accident will lead to radiation release—potentially at catastrophic levels. Diablo Canyon presents an even riskier case, given a significant lack of maintenance or upgrades at the facility, recent seismic discoveries in the area, and the plant's use of an outdated cooling mechanisms. In addition, there are grave questions about the physical integrity of the Unit 1 pressure vessel, the

---

[9] As explained in the CNC Guidance, the selected reactor may include expenditures on "Enhancements" in their bid, defined as "capital expenditures for life-extension, uprates or for other purposes," CNC Guidance at 7, subject only to the limitation that annual payments to the reactor will be adjusted downward to the extent that the actual total capital expenditures categorized as either Enhancements or Sustaining for that award year are less than projected.

receptacle that contains the highly radioactive core of a nuclear reactor. Despite being one of the most critical single components in any reactor cooling system, NRC has repeatedly delayed and extended the time period in which it is required to inspect this vessel for possible embrittlement. Indeed, it has still not done so despite being over 14 years overdue.[10]

40.   Here, a reactor accident at Diablo Canyon could put tens of thousands, if not hundreds of thousands, of people in Central California at risk of radiation exposure. Should southerly winds prevail, a radioactive plume could threaten millions of Southern Californian residents, from Santa Barbara to Los Angeles and beyond. Radiation released into the Pacific Ocean could endanger sensitive marine and coastal resources and fragile habitats as well.

41.   In addition, scientists' understanding of the geologic and seismic environment surrounding DCPP has grown substantially since the facility site was first studied over 50 years ago (and since 1993 when the last NEPA analysis of the full facility occurred). In fact, in recent years, scientists have discovered several *new* earthquake faults, including the Shoreline, San Luis Bay, and Los Osos faults, which were not known when the facility was originally assessed for seismic risks. Whether or not the DCPP would be able to withstand the level of ground motion that could result from an earthquake caused by these new faults and/or shut down safely if needed, has been a subject of ongoing pubic concern and dispute, but has never been the subject any NEPA process or evaluation by the federal government, project stakeholders, or interested members of the public.

42.   Diablo Canyon also damages the environment of Central Coastal California each day through its use of an outdated once-through cooling system.

---

[10] Friends presently has a case before the Ninth Circuit Court of Appeals challenging the NRC administrative decisions that have resulted in the ongoing delay of this vital inspection.

Complaint for Declaratory and Injunctive Relief

The plant draws in an estimated 2.5 billion gallons of ocean water per day for cooling purposes and discharges that water back into the Pacific Ocean approximately 20 degrees hotter. Such systems are well-known to cause an array of environmental harms including ecological damage from the thermal discharge into the ocean environment; impingement of fish and wildlife, in which they are trapped against intake screens; and entrainment, where fish and wildlife, including federally-listed sea turtles, are carried through the cooling system itself. In light of these impacts, in 2011, California initiated a new policy to end once-through cooling systems at coastal power plants, but as a result of extensive lobbying by PG&E, coupled with its planned retirement, Diablo Canyon was exempted from the phaseout. Despite its new plans to stay open, the facility remains exempt from this policy.

43.   Today, Diablo Canyon annually draws into its antiquated cooling system more than a billion fish in early life stages; most die. And thermal discharge from the DCPP has wholly reshaped the benthic environment in the vicinity of the plant, leading to a collapse of the sea urchin and abalone populations. 89 Fed. Reg. at 72. The cooling system has also resulted in significant levels of take of federally-listed threatened and endangered sea turtles. In 2005 the Nuclear Regulatory Commission conducted a Biological Assessment under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, that determined that "continued operation of the DCPP may adversely affect the green sea turtle, loggerhead sea turtle, leatherback sea turtle, and olive ridley sea turtle." *Id.*

44.   In light of the persistent radiological accident risk from this over 50-year old facility and the compounding ecological harm, public opposition to DCPP mounted over the years, and in 2016, culminated in a groundbreaking, formal agreement that ensured the retirement of Diablo Canyon's reactors in

2024 and 2025, provided a just transition for its affected workforce, and set the stage for California to take action toward a safe, justly-sourced, renewable energy future. Friends was party to this agreement, and in exchange, agreed to dismiss its active legal challenges over the facility's safe operation.

45.   Plans to shutter the DCPP, however, began to reverse course in 2021 and 2022, as a result of substantial legislative and financial assistance from both the state and federal governments: specifically, the IIJA, which authorized the CNC Program directing DOE to dispense $6 billion in credit awards to certified nuclear reactors, and California's SB 486, which opened a pathway for PG&E to seek a license extension for Diablo Canyon, including applying for certification under the CNC Program.

*CNC Conditional Award to Diablo Canyon*

46.   PG&E submitted an application to DOE for certification before the September 6, 2022 deadline, and on November 21, 2022, DOE issued a conditional award of credits under the CNC program to PG&E for the Diablo Canyon Power Plant.[11]   The application itself has never been made public and it was likewise withheld from Friends' recent and still pending Freedom of Information Act Request. In announcing this conditional award, DOE stated that "Units 1 and 2 at the Diablo Canyon Power Plant were scheduled to be decommissioned in 2024 and 2025, but this conditional award of credits valued at up to $1.1 billion, creates a path forward for Diablo Canyon to remain open."[12]

---

[11] DOE, Press Release (November 21, 2022),
https://www.energy.gov/articles/biden-harris-administration-announces-major-investment-preserve-americas-clean-nuclear.

[12] DOE, Civil Nuclear Credit Award Cycle 1, https://www.energy.gov/gdo/civil-nuclear-credit-award-cycle-1.

Complaint for Declaratory and Injunctive Relief

*Adoption of NRC NEPA Documents*

47.    Taking one step closer to finalizing the credit award, on August 4, 2023, DOE published a notice that it had adopted the NRC's prior NEPA documentation for Diablo Canyon as the final DOE FEIS for the award of credits under the CNC program.[13] The only NRC NEPA documents that were adopted and republished as DOE's Final EIS are as follows:

- 1973 U.S. Atomic Energy Commission Final Environmental Statement ("ES")[14];

- 1976 NRC Addendum to the 1973 ES;

- 1993 NRC Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), which evaluated NRC's decision to extend the reactor licenses in order to recapture time spent solely in construction by starting the 40-year period from the time the units were first operational;

- 2003 NRC EA on Independent Spent Fuel Storage Installation ("ISFSI");

- 2007 NRC Supp. EA and FONSI on Independent Spent Fuel Storage Installation.

48.    The following is a brief background on the scope of these documents, all but the first of which were prepared by the NRC. The 1973 ES comprised the

_____

[13] *See* Notice of Adoption of Nuclear Regulatory Commission National Environmental Policy Act Documentation for the Operation of Diablo Canyon Power Plant and Republication as a Final DOE Environmental Impact Statement for Award of Credits to Pacific Gas and Electric Company Under the Civil Nuclear Credit Program, 88 Fed. Reg. 51798 (August 4, 2023) (adopting NRC's NEPA documentation and republishing it as a single DOE EIS (DOE/EIS–0555)); *see also* DOE/EIS-0555, available at https://www.energy.gov/nepa/articles/doeeis-0555-final-environmental-impact-statement.

[14] Note that at the time the 1973 document was drafted, the detailed statement required under NEPA was termed a "Final Environmental Statement" or "ES."

Complaint for Declaratory and Injunctive Relief

first full environmental assessment of the DCPP and was prepared by the U.S. Atomic Energy Commission ("AEC"), the predecessor agency to the NRC. AEC listed the proposed action as the "continuation of construction permits . . . and issuance of operating license to the Pacific Gas and Electric Company for the Diablo Canyon Units 1 and 2, located on the California coast 12 miles southwest of San Luis Obispo" and cooled by "once-through flow of water from the Pacific Ocean." 1973 ES at i. The principal alternatives considered were "sources of energy other than nuclear," "construction of an equivalent plant at some other site," using cooling towers instead of once-through cooling, and different locations for the thermal discharge. *Id.* at ii.

49.    For the proposed action, the agency identified the following general categories of impacts from operation of the plant: (1) the discharge of heated water into the cooler water of the Pacific Ocean; (2) release of background radiation into the environment at a level that was "not considered to be significant when compared to the natural background radiation dose"; (3) a "very low risk of accidental radiation exposure" from a range of postulated accident scenarios, *see* 1973 ES at 7-1 - 7-7; and (4) a series of ocean impacts including: an "ecological shift in benthic organisms and fish" due to the thermal discharge, some discharge of chemicals used for cooling, a decline in dissolved oxygen considered to be minimal, loss of phytoplankton considered to have an insignificant impact on the local ecosystem, loss of "some small fish (less than 3 inches) . . . killed as a result of impingement or entrainment in the cooling system, "and some potential for increased mortality of avian species from contact with transmission line facilities." *Id.* at ii. The identified risks of impingement focused on fish and jellyfish, drawn into the cooling water intake; and the risk of entrainment was described only as to "small organisms passing through the pumps and condenser tubing." *Id.* at 5-13 - 5-14. And as DOE now explicitly

Complaint for Declaratory and Injunctive Relief

concedes, the 1973 ES contained no assessment *at all* of any cumulative risks or impacts of that action, *see* 89 Fed. Reg. at 73, as it was not required under NEPA—then a new law—as originally drafted.

50.    The ES also included a discussion of the site for the plant location that addressed regional demography as well as geology and seismology. *See id.* at 2-1 - 2-29. The description of the site included an analysis of the 1970 population levels in nearby towns (ranging from 3,487 in Baywood Park-Los Osos to 28,036 in San Luis Obispo), as well as the distance to low-population zones (6 miles), the population center (10 miles), and the nearest residence (1.5 miles). *See id.* at 2-4. The AEC also addressed regional demography, noting that in 1970 the population of San Luis Obispo County was 105,690. *See id.* at 2-4, 2-12.

51.    The analysis of seismology, including earthquake risk, in the 1973 ES was limited to 2 pages and discussed only possible site disruption and ground acceleration from earthquakes on three identified faults: the Nacimiento fault (20 miles away), the San Andreas fault (48 miles away) and possible aftershocks, or the offshore Santa Ynez fault (50 miles away). *See id.* at 2-28-2-29. Without disclosing or conducting any analysis, the AEC cursorily asserted that "[t]he Diablo Canyon plant has been designed to withstand safely such earthquakes as discussed in the staff's Safety Evaluation Report." *Id.* at 2-29. The Safety Evaluation Report was prepared in 1969, 55 years ago, and most importantly, before the discovery of new fault lines in the area. *See id.* at 2-53 (listing references). There was no discussion at all of cumulative impacts from existing or reasonably foreseeable actions that will affect the same resources impacted by the DCPP. *See* 89 Fed. Reg. at 73.

52.    The 1976 Addendum to the ES was prepared to address two additional impacts not covered in the original ES that arose during construction of the plant: impacts from the construction of transmission lines from the plant and the

Complaint for Declaratory and Injunctive Relief

destruction of the benthic ecosystem of Inlet Cove as a result of siltation generated by construction of the intake structure. *See* 1976 Addendum at i. The Addendum provided a modified assessment of some impacts from operation of the plant, "some of which are now considered to differ in extent and/or intensity from those described in the Final Environmental Statement." *Id.* These included, among other impacts, a modified analysis of the impacts of thermal discharge and the size and area of the thermal plume, and an analysis of the excessive amount of both copper released and foam formed during the testing of the cooling water system. *Id.* The NRC also addressed fish impingement and entrainment impacts—but not for other wildlife—and asserted that the impact would be low. *Id.* There was no discussion of population demography and no discussion of seismic risks other than to promise forthcoming information in an NRC staff report: "Because of the importance of the geologic stability of the Diablo Canyon site, this seismic review has continued throughout the construction phase. The results of this investigation, with increased emphasis on offshore fault zones, will be published in the staff's Operating License SER." 1976 Addendum at 14. As in the original ES, there was no discussion (let alone analysis) of cumulative impacts. *See* 89 Fed. Reg. at 73.

53. The 1993 EA and FONSI were directed to NRC's decision to extend the 40-year license period such that it would begin, not with the construction permit as originally issued, but at the time when the units actually became operational (thereby "recapturing" the years spent in construction). The EA emphasized that because the evaluations for the original ES were based on a "40-year operating life" and the action of extending the expiration dates to cover the full 40 years of operation did not entail any physical modifications, "there are no new or unreviewed environmental impacts that were not considered as part of the

Complaint for Declaratory and Injunctive Relief

Final Environmental Statement (FES) dated May 1973, relating to operation of the DCPP, Units 1 and 2." 1993 EA at 2.

54.  The EA did discuss certain impacts, such as exposure impacts from a postulated accident, including updated population projections through 2025, which it concluded "will not significantly impact any accident analysis previously calculated." *Id.* at 3. It also found no new ecological impacts from the plant's cooling system. *Id.* at 8. However, it contained no discussion of earthquakes or seismic risks. In the end, NRC concluded that "the effects of changing the expiration date . . . are bounded by the assessment in the original FES"; "[i]n addition, based on the above, the Commission concludes that there are no significant environmental impacts associated with the proposed amendment." *Id.* at 14. Again, there was no discussion of cumulative impacts. *See* 89 Fed. Reg. at 73 (noting that first discussion of *any* cumulative impacts is in the 2003 ISFSI EA).

55.  The last two NRC NEPA documents that DOE adopted here were a 2003 EA, limited in scope to NRC's narrow decision to issue a site-specific license to build and operate an Independent Spent Fuel Storage Installation ("ISFSI") on the DCPP site, and a 2007 Supplemental EA also addressing the ISFSI, but restricted to assessing the environmental impacts from potential terrorist acts. The 2003 EA did not have any new comprehensive assessment of the risk of radiation exposure from postulated accidents and mentioned earthquakes only once in passing, but offered no new analysis of seismology at the site. *See* 2003 EA at 19. The only comment by the NRC addressing the impact of such accidents, including earthquakes, was to define them and then point to a separate report—prepared by PG&E as part of its license application and not even included in the EA or its list of references. Specifically, noting that

Complaint for Declaratory and Injunctive Relief

severe events like earthquakes are included among Design Events III and IV, NRC said only that:

> Design Event III represents an infrequent event that could be reasonably expected to occur over the lifetime of the ISFSI. Design Event IV represents an extremely unlikely event that is postulated to occur because it establishes a conservative design basis for systems, structures, and components important to safety. *Design Events II through IV are addressed in Chapter 8 of the Diablo Canyon ISFSI SAR*.

2003 EA at 19 (emphasis added). The 2007 Supplement was limited to adding a terrorism analysis and also did not provide any comprehensive update to accident risk that could ostensibly be relied upon by DOE here. *See* 2007 Supplement at 6-7.

56.    The 2003 EA did not contain any updated analysis of marine impacts because NRC found that "the proposed ISFSI activities will not result in discharges to the marine environment, and thus, there will be no impact on these species." 2003 EA at 13. The 2003 EA is the only DOE-adopted NEPA document to address cumulative impacts in any way, but this single paragraph represents the entirety of its consideration of cumulative effects:

> The NRC has evaluated whether cumulative environmental impacts could result from the incremental impact of the proposed action when added to the past, present, or reasonably foreseeable future actions in the area. The impact of the proposed Diablo Canyon ISFSI, when combined with previously evaluated effects from the Diablo Canyon Power Plant, is not anticipated to result in any significant cumulative impact at the site. The offsite radiation exposure limits for an ISFSI specified in 10 CFR 72.104(a) explicitly include any contribution to offsite dose from other uranium fuel cycle facilities in the region. Therefore, the offsite dose contribution from the DCPP has been included in the evaluation of radiological impacts from the proposed Diablo Canyon ISFSI.

2003 EA at 20. The 2007 Supplemental EA did not address either issue.

57.    In sum, and considering the adopted NEPA documents in full, the only assessments of population demography and postulated accident scenarios

Complaint for Declaratory and Injunctive Relief

directly disclosed in a NEPA document include: the baseline analysis first set forth in the 1973 ES, the updated population projections in the 1993 EA, and terrorism risk scenarios added in the 2007 Supplemental EA. The question of seismic risks and area fault lines was also first set forth in the 1973 ES and has not been updated by the agency *in any NEPA document* since that time. The marine impacts from thermal discharges on marine ecology and the benthic community, in particular, were first set forth in the 1973 ES, updated to account for unanticipated impacts in the 1976 Addendum, and are noted to be unchanged in the 1993 EA.

58.   Impacts to federally-listed sea turtles were never disclosed or analyzed in *any* of the NRC NEPA documents. Similarly, there has been no discussion of cumulative impacts—whether involving climate change impacts or earthquake scenarios—in any of the NRC NEPA documents. In fact, the only mention of cumulative impacts at all in the adopted documents is in the 2003 EA, which made a perfunctory and inadequate passing mention dismissing the question of cumulative impacts from offsite radiation exposure from the new ISFSI facility on site in conjunction with other uranium fuel cycle facilities in the area. In addition, analysis of aging plant infrastructure or potential embrittlement of critical features, including the pressure vessel, also does not appear in *any* of the adopted NEPA documents. This is a particularly glaring omission, in light of the facility nearing the end of its assumed 40-year operational lifespan and considering that the agency action here has the direct result of extending the plant's lifespan beyond anything that has been previously considered, approved, or analyzed under NEPA.

59.   And yet, after reviewing these prior documents, DOE determined that "there was sufficient information in the documents reviewed by DOE to complete DOE's analysis and to determine that [these] NEPA documents remain adequate,

Complaint for Declaratory and Injunctive Relief

despite the age of many of these documents." 88 Fed. Reg. at 51800. Despite the obvious gaps and defects in analyses detailed above, DOE asserted that there were no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed award of credits or the impact of the award of credits" and therefore determined that "no supplemental EIS is required." *Id.*

60.   Failing to recognize the obvious differences between constructing two new nuclear reactors, as was the proposed action in 1973, and the act of using a major injection of significant taxpayer funds to keep two nuclear reactors operational beyond the lifespan that was ever evaluated under NEPA, DOE also claimed that the action of issuing a final award of CNC credits is "substantially the same"  because "both the NRC's issuance of an operating license to DCPP pursuant to the NEPA documents and DOE's award of credits under the CNC Program for DCPP have the purpose and effect of allowing for the continued operation of DCPP." In reality, not only are the actions themselves fundamentally different in that one considered licensing the DCPP in the first instance and one considered extending the life of two nuclear reactors nearing the of their operational lifetime and under very different real-world conditions, but the relevant analytical time frames of the prior NEPA analyses did not (and were not intended to) evaluate the impacts of, or alternatives to, operating the DCPP past their 2024 and 2025 license expiration dates.

61.   Having found the existing NEPA documents "adequate" and concluded that the credit award was "substantially the same" as the original action (which did not involve *any* federal funding from DOE), DOE decided to adopt and republish the existing NRC NEPA documents in final form as a single document which it called a "Final EIS": DOE/EIS-0555. By calling it a Final EIS rather than a Draft EIS, DOE seemingly attempted to bypass the legal procedures that are required for every draft EIS, including the requirement for comment by

Complaint for Declaratory and Injunctive Relief

subject matter experts (e.g., seismologists), project stakeholders, and interested members of the public.

62.   Notably, DOE also chose to add approximately 12 pages of *new* discussion and analysis of impacts embedded in that same document—albeit still lacking necessary analysis—despite the fact the purported purpose of that document was solely to adopt the earlier NRC NEPA documents and merely republish them. In other words, DOE both asserted that it could satisfy its NEPA obligations merely by adopting the prior analyses by other agencies, but nonetheless added ostensibly new discussion that, if anything, only underscored a number of issues that still need proper analysis and disclosure to the public in order to comply with NEPA.

63.   First, DOE used these extra pages to brush aside the issue of several newly discovered earthquake faults that were unknown to NRC at the time of the original 1973 ES, and which have still yet to receive a requisite "hard look." DOE acknowledged that there are significant gaps in seismic analyses of the earlier NEPA documents: "PG&E provided to the NRC a significant amount of more recent geologic environment information that supplements the content in the 1973 ES and 1976 ES Addendum." July 2023 FEIS at 8. And yet it dismissed the need to conduct any additional NEPA analysis on seismic risks because NRC previously conducted its own internal assessments of the new data and found that it was safe for the plant to continue operating. *Id.* In other words, despite having absolutely no awareness—let alone discussion—of these new fault lines, or opportunity for public comment on the risks they pose, the 51-year-old analysis of seismological effects was deemed "adequate."

64.   Next, DOE used additional language in attempt to justify why no additional NEPA analysis or public disclosure was warranted for the ecological impacts from thermal discharge, impingement, or entrainment. DOE evidently

Complaint for Declaratory and Injunctive Relief

came to this conclusion—not based on any analysis of its own or any review of peer-reviewed scientific studies—but by relying exclusively and heavily on excerpts from the dated Environmental Report prepared by none other than PG&E itself ("2009 ER"). Commercial nuclear power plants are required to submit a report to NRC each year describing their effects on the environment. In other words, an ER is not an objective scientific assessment, but rather an industry report with every incentive to minimize or downplay environmental impacts.

65.   With regard to impingement impacts, DOE reported only that the 2009 ER concluded that "entrainment impacts to marine fish and shellfish resources from operation of DCPP's once-through cooling system . . . were projected by PG&E to be small." July 2023 FEIS at 9. Similarly for impingement impacts, DOE explained only that the 2009 ER stated that PG&E completed an impingement assessment of the once-through cooling system in 1986, which "concluded that impingement of all marine organisms was very low, *and further studies were not warranted.*" *Id.* at 9 (emphasis added). Lastly, DOE relayed that PG&E's 2009 ER "concluded that heat shock impacts to fish and shellfish resources from operation of the once-through cooling system . . . were projected to be small." These self-serving representations by the licensee, however, are neither a comprehensive review and analysis of the applicable scientific record on this issue as required by NEPA, nor did DOE provide subject matter experts or the public any opportunity to identify other scientific literature or evidence— including information post-dating PG&E's 2009 ER—bearing on the proposed action's significant environmental impacts due to thermal discharge, impingement, or entrainment.

66.   With regard to impacts to federally-protected sea turtles, DOE disclosed that a 2005 Biological Assessment prepared by NRC identified that

Complaint for Declaratory and Injunctive Relief

"continued operation of DCPP may adversely affect the green turtle, loggerhead turtle, leatherback turtle, and olive ridley turtle." July 2023 FEIS at 9. DOE also disclosed that PG&E reported in 2009 that had been "nine incidences of power plant intake structure impingement/trapping of threatened green sea turtles entrained in the cooling system of this facility between 1994 and 2009; all were released back into the ocean." *Id.* But DOE did not recommend any further analysis of sea turtle impacts, whether under NEPA or under the separate requirements of the ESA. Rather, DOE determined that the existing NEPA documentation on these impacts, i.e. the 1973 ES and 1976 Addendum, despite containing no discussion of sea turtle impacts at all and extremely outdated analysis of other marine impacts, "remain[] adequate through the current operating licenses." *Id.* at 10.

67.   Despite all of these issues demanding proper attention and analysis through NEPA by both DOE and the public, DOE concluded that no additional NEPA analysis of ecological impacts was required by asserting that "PG&E is required to comply with Federal, state, and local environmental regulations, agreements" to protect ecological resources, and the CNC Program "would not change the operating configuration or environmental impact of the DCPP facilities." *Id.* at 10. As a result, DOE asserted that it does not have to take its own hard look at the current state of these fragile ecological resources —or solicit comment from subject matter experts and the public on these matters. *Id.*

68.   The agency also explained that while neither the 1973 ES nor the 1976 Addendum addressed cumulative impacts *at all*, the prior NEPA documentation did somehow "adequately address cumulative impacts" because the 2003 EA and FONSI on spent fuel storage at DCPP included a single sentence dismissing the risk of cumulative impacts of offsite radiation. And DOE also pointed to another one of PG&E's past ERs, this one from 2014, that also

Complaint for Declaratory and Injunctive Relief

purportedly addressed some—but not all—relevant cumulative impacts. *Id.* at 17. The fact remains, however, that none of the adopted NEPA documents, nor DOE's new analysis in its republished Final EIS, have ever evaluated the cumulative impacts of existing and reasonably foreseeable actions that will affect the same resources that DOE's decision will impact by extending the life of the DCPP. At bare minimum, DOE must look at the cumulative effects of climate change and its impact on ocean temperatures and aquatic wildlife species, potential climate change impacts to systems and equipment at the facility that would threaten plant safety,[15] and the probability of seismic events from newly discovered fault lines that also threaten the safety of plant operations.

69.    Irrespective of the lacking analysis in DOE's adopted Final EIS, DOE failed to subject its EIS (including the 12 new pages of purported analysis) to any public comment, public hearing, or other scrutiny that would have allowed subject matter experts, stakeholders, and interested members of the public to address DOE's cursory assumptions, provide relevant information and evidence to inform DOE's consideration of impacts and alternatives, and propose measures to reduce and/or mitigate impacts to various resources. As such, information disclosed for the *first time* in a "Final" EIS is not a proper method under NEPA to share supplemental analysis and can in no way satisfy the agency's NEPA obligations under the CNC Program. And, in fact, the limited discussion DOE did

---

[15] The Government Accountability Office ("GAO") recently issued recommendations to NRC to specifically address increased risks to nuclear power plants from climate change. The GAO determined that NRC's actions to assess risks from natural hazards "do not fully consider potential climate change effects," including damage to systems and equipment from heat, extreme weather, and storm surges, among other impacts. GAO Report. NRC Nuclear Power Plants: NRC Should Take Actions to Fully Consider the Potential Effects of Climate Change (April 2, 2004), https://www.gao.gov/products/gao-24-106326. DOE must address these same cumulative impacts here.

offer only raises serious questions about why it did not address all of these issues in a proper, transparent NEPA analysis subject to public scrutiny.

*Record of Decision and Final Award*

70.    On January 2, 2024, DOE published its ROD authorizing the final award of credits to Diablo Canyon under the CNC program. 89 Fed. Reg. at 69. This decision enables PG&E to receive payments over a four-year period from January 2023 to December 2026 in connection with Diablo Canyon, with payment of credits set to begin in 2025 and "will be paid retroactively to compensate PG&E for DCPP operations in the prior year(s)." *Id.*

71.    The financial assistance from the CNC credit award will allow Diablo Canyon to be operational at a minimum through 2026, and likely beyond. In other words, even if NRC's administrative exemption will permit Diablo Canyon to operate past the expiration of its licenses in 2024 and 2025, no NEPA analysis has ever considered the environmental impact of these units being operational beyond that timeframe—operation that could not have occurred without DOE's injection of substantial federal funding to extend the lifespan of these nuclear reactors.

72.    As in the July 2023 FEIS document, DOE once again claimed in the ROD that it had "considered changes to the affected environment and environmental impacts of DCPP operation since the publication of the 1973 ES" and proceeded to repeat the same post-hoc discussion of environmental impacts that it had added into the FEIS document, despite the fact that none of the new "analysis" was ever part of any formal NEPA analysis or disclosed to the public before being republished as a "Final EIS." *See* 89 Fed. Reg. at 70-73.

73.    While most of the ROD's discussion of environmental impacts largely repeats what DOE shoehorned into the July 2023 FEIS adoption document, DOE does make an additional concerted effort in the ROD to explain the obvious lack

Complaint for Declaratory and Injunctive Relief

of any cumulative effects analysis in the NRC NEPA documents. *See* 89 Fed. Reg. at 73. But this is simply not enough. First, DOE again acknowledges that cumulative impacts were not considered at all in the original 1973 ES, but argues that their consideration in the 2003 ISFSI EA and one other non-NEPA document, the 2014 ER Amendment prepared by PG&E (which DOE admits is not comprehensive), together are legally sufficient to satisfy DOE's duty to fully evaluate cumulative effects. But they do not even come close. The 2003 ISFSI EA was focused only on offsite radiation impacts of spent fuel storage and thus is not a substitute for the full range of cumulative impacts related to extending the lifespan of DCPP. The 2003 ISFSI EA has a single paragraph on cumulative impacts, *see* supra ¶ 56, which was limited to the question of offsite radiation exposure. And the 2014 ER Amendment was not a NEPA document and cannot stand in for one. DOE admits that this report did not in fact address cumulative impacts for "Noise, Environmental Justice, Waste Management, [or] Global Climate Change." 89 Fed. Reg. at 73.  And even if it were comprehensive, which it was not, unless it was disclosed to the public for comment at some point under 40 C.F.R. § 1503.1, it cannot satisfy the agency's NEPA obligations now.

74.  Still attempting to paper over this gaping hole in its NEPA analysis (or lack thereof), DOE also attempts to argue that the missing cumulative impacts analysis is not problematic because "[w]ith respect to overall cumulative impacts, DCPP's continued operation is governed by Federal and State permits, licenses and plans which ensure that any impact from DCPP's continued operation are minimized. . . . Therefore, DOE has determined the NEPA documentation and other supporting documents adequately address cumulative impacts for continued operation through the period DCPP's current NRC licenses remain in effect." *Id.* But the existence of state and federal permitting programs cannot be used as an excuse to bypass an entire category of impact analysis under NEPA, especially

where none of the adopted NEPA analyses have even contemplated or analyzed DCPP operation past the current license expiration. Were that acceptable, it would render the cumulative impact analysis requirement under NEPA and its regulations effectively void.

## CLAIM FOR RELIEF

75.  Plaintiff hereby incorporates Paragraphs 1-74 by reference.

76.  By adopting a collection of prior, outdated NEPA documents as its Final EIS that, even taken together, do not constitute an adequate EIS because they fail to take a hard look at reasonably foreseeable direct, indirect, and cumulative impacts associated with DOE's action both through 2026 and for as long as the DCPP is likely to remain operational after 2026 as a result of the award—including, but not limited to, the current impacts of potential accidents that could result in radiation release, updated demographic information, the safety of aging plant infrastructure, the seismic risk posed by recently discovered earthquake faults, the current ocean impacts of thermal discharge from DCPP's once-through cooling system and related wildlife impacts, or cumulative impacts relating to myriad resources affected by DOE's action—DOE violated NEPA, its implementing regulations, and the APA.

77.  By adopting a collection of prior NEPA documents as its EIS, bypassing any draft publication, and publishing it as "final" without opportunity for notice and comment even though the action under review is not "substantially the same" as the original action—because the action, the potential impacts, the purpose and need for the action, and the range of possible alternatives are all fundamentally different—DOE violated NEPA, its implementing regulations, and the APA.

78.  By failing either to supplement the existing NEPA documents from other agencies, or to prepare its own original adequate statement, and publish the

Complaint for Declaratory and Injunctive Relief

new analysis as a draft available for public comment under 40 C.F.R. § 1503.1, DOE violated NEPA, its implementing regulations, and the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment for Plaintiff ordering the following relief:

1.    Declaring that Defendants have violated NEPA and its implementing regulations and also have acted arbitrarily, capriciously, and contrary to law under the APA;

2.    Setting aside DOE's January 2024 ROD and July 2023 FEIS, and remanding those matters to DOE for further consideration consistent with applicable federal law;

3.    Enjoining DOE from taking any further actions in furtherance of the CNC award for Diablo Canyon until DOE has fully complied with federal law;

4.    Awarding Plaintiff its costs of litigation, including reasonable expert fees and attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable provision of law; and

5.    Granting Plaintiff such further relief as may be necessary and appropriate or as the Court deems just and proper.

Dated: April 2, 2024

Respectfully submitted,

/s/ *Michael Lozeau*
Michael Lozeau
Richard Drury
Lozeau Drury LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
(510) 836-4200
richard@lozeaudrury.com

*/s/ Jessica F. Townsend*
Jessica F. Townsend

36
Complaint for Declaratory and Injunctive Relief

Pro hac vice application forthcoming
(202) 780-7286
jessica@eubankslegal.com

*/s/ William S. Eubanks II*
William S. Eubanks II
Pro hac vice application forthcoming
(970) 703-6060
bill@eubankslegal.com
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

*Counsel for Plaintiff*

Complaint for Declaratory and Injunctive Relief